**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

**ROBERTO C. RIVERA,**      :
     :
     **Plaintiff**      :
     :      **CIVIL NO. 3:CV-10-0505**
     **v.**      :
     :      **(Judge Caputo)**
**GOVERNOR ED RENDELL,** *et al.*,      :
     :
     **Defendants**      :

**M E M O R A N D U M**

**I.  Introduction**

This is a civil rights action filed pursuant to 42 U.S.C. § 1983.  Plaintiff Roberto Rivera, an inmate incarcerated at the State Correctional Institution in Dallas, Pennsylvania (SCI-Dallas), has filed suit against various prison officials contending that they violated his constitutional rights by disregarding his mental health needs when they revoked his single cell housing code and then failed to reinstate it after he was placed in a Psychiatric Observation Cell (POC), and then the Restricted Housing Unit (RHU), after lighting his cell on fire.[1]  Mr. Rivera also claims Dr. Kale, his former psychiatrist, was deliberately indifferent to his serious mental health needs when he failed to renew his psychotropic medications.

_____

[1] The following defendants are employed by the Pennsylvania Department of Corrections (DOC) and worked at SCI-Dallas at all times relevant to this action: Deputy Superintendent Walsh, Unit Manager (UM) Goyne, Counselor Sokaloski and Psychological Services Specialist Lopuhovsky. DOC defendants and Dr. Kale are represented by separate counsel.

Both the DOC defendants and Dr. Kale move for summary judgment pursuant to Fed. R. Civ. P. 56. Mr. Rivera has filed a single brief in opposition to both defendants' motions. He also filed a Fed. R. Civ. P. 56(d) motion to conduct additional discovery and to supplement his opposition to the DOC defendants' summary judgment motion relative their assertion of lack of personal involvement and discretion to rely on Mr. Rivera's treating mental health professionals when adjusting his Z Code status.

For the following reasons Dr. Kale's motion for summary judgment will be granted, the DOC defendants' motion for summary judgment will be granted in part and denied in part. Also, Mr. Rivera will be granted a limited time to conduct discovery solely related to Defendant Walsh's decision to release him from the RHU without awarding him a Z Code status.

## II. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is material if it might affect the outcome of the suit under governing law." *Lupyan v. Corinthian Colls. Inc.,* 761 F.3d 314, 317 (3d Cir. 2014)(citing *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011)). The court "`must view all evidence and draw all inferences in the light most favorable to the non-moving party," and we will only grant the motion if "no reasonable juror could find for the non-movant." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

At summary judgment the moving party must identify evidence that demonstrates an absence of a genuine issue of material fact. *Budhun v. Reading Hosp. and Medical Cntr.*, 765 F.3d 245, 251 (3d Cir. 2014)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). The movant must support his position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by showing that the nonmoving party "failed to make a sufficient showing to establish the existence of an element essential" to that party's case. *Celotex*, 477 U.S. at 322, 106. S.Ct. at 2552.

After the moving party has met its initial burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). "The non-moving party cannot rest on mere pleadings or allegations," *El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 231 - 32 (3d Cir. 2001). The nonmoving party must "go beyond the pleadings" and either by affidavits, deposition, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The nonmoving party "must support the assertion" that a fact is genuinely in dispute by: "(A) citing to particular parts of materials in the record . . .; or (B)

showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); see also Fed. R. Civ. P. 56(e)(2) (if a party fails to properly support an assertion of fact, or address an another party's assertion of fact, the court may consider the fact undisputed for the purpose of the motion).

In ruling on a motion for summary judgment, the court must use the same evidentiary standard that would apply at trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) ("the inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits"); *Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 129 (3d Cir. 2005). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (internal quotation marks omitted); *NAACP v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 476 (3d Cir. 2011).

### III. Statement of Undisputed Facts

The following facts are undisputed unless otherwise indicated, and are taken from the parties' Statement of Material Facts and Mr. Rivera's Response thereto and supporting documentation of record, and are viewed in the light most favorable to the non-moving party, Mr. Rivera.[2]

### A. SCI-Dallas' Single Cell Policy

The Pennsylvania Department of Corrections (DOC) has established a policy with respect to the reception, classification and housing of inmates. (Doc. 136-3, DOC Policy 11.2.1, Reception and Classification, dated April 1, 2003.) Section 5 of Policy 11.2.1 sets forth the DOC's guidelines for the Single Celling, or Z Code, and Double Celling Housing. (Doc. 136-3, ECF pp. 23 - 26.) A Z Code is a housing code given to inmates who are not to be assigned a prison cellmate. (Doc. 136-2, DOC Defs.' Statement of Material Facts (DSMF) ¶ 4.) The policy establishes a process for evaluating and processing inmates for consideration for single cell status. (Doc. 136-3, ECF p. 24.) The policy sets forth several guidelines for consideration when evaluating an inmate for a Z Code housing classification. (*Id.*)

---

[2] Although Mr. Rivera filed a response (Doc. 144, ECF pp. 15 - 25) to Dr. Kale's and the DOC Defendants' statements of material facts, it does not comply with the requirements of Pa. M.D. Local Rule 56.1. While Mr. Rivera "denies" many of the facts set forth in both defendants' statement of undisputed facts, he does not cite to evidence in the record to demonstrate that those facts are genuinely disputed. As such, the facts set forth by Dr. Kale and the DOC Defendants will be admitted unless properly controverted by Plaintiff's evidentiary materials. *See* M.D. Pa. Local Rule 56.1 and Fed. R. Civ. P. 56 (c)(3).

Under Section 5(c) of the policy, an inmate who meets "any of the following criteria shall be carefully reviewed by staff and considered for Program Code 'Z' housing classification":  (A) inmates who are evaluated by psychiatric or psychological staff as having mental health problems (examples of mental health problems include conditions where the inmate is dangerous to self, dangerous to others, is self-mutilative, unable to care for self, and/or where the inmate is being actively monitored by the Psychological Review Team (PRT)); (B) inmates with medical conditions indicating a possible need for a single cell (infectious disease, colostomy, etc.); (C) inmates who staff believe may be victimized as a result of double celling; (D) an inmate who has a documented history of predatory behavior toward cell partners or who staff has reason to believe would exhibit assaultive or predatory behavior towards cellmates; (E) an inmate with known or documented homosexual behavior.  (*Id*. at ECF pp. 24 - 25; DSMF ¶ 5.)

When reviewing an inmate for a Z Code, facility staff complete a review of documentation and information reflecting the inmate's overall institutional adjustment, including misconduct reports, recommendations from medical and/or psychiatric or psychological staff, and reports from other staff who have knowledge about the inmate's adjustment and behavior.  (DSMF ¶ 9.)  If there is a recommendation to grant or revoke a Z Code housing status, "a DC-46 Vote Sheet along with other relevant information shall be circulated to the Facility Manager/designee who shall make the final decision."  (Doc. 136-3, ECF p. 25; DSMF ¶ 8 and ¶ 11.)

"A 'Z' Code housing status is not necessarily a permanent status.  An inmate who is classified with a 'Z' Code shall be reviewed at least annually and at any other staffing to insure the code is still the most appropriate housing classification."  (Doc. 136-3, ECF p.

26.)  The housing policy also provides for "[l]ong-term inmates who are serving a sentence of 10 years or more may be considered for a single cell provided space is available. These inmates shall be assigned a Program Code A to differentiate them from Program Code Z inmates."  (Doc. 136-3, ECF p. 25.)

### B.    Mr. Rivera's Mental Health History

Plaintiff, Roberto Rivera, is a DOC inmate serving a life sentence.  (DSMF ¶ 1.)  He has been confined to SCI-Dallas since 1989.  (DSMF ¶ 2.)  Although he had no pre-incarceration history of psychiatric treatment, post-incarceration he has received treatment for depressive symptoms since 1989 and has taken psychotropic medication for anxiety. (Doc. 132-4, Dr. Kale's Statement of Material Facts (KSMF), ¶ 5.)  Dr. Dola Kale, a psychiatrist, has seen Mr. Rivera at SCI-Dallas since 2000.  (*Id.*)

Overall, Mr. Rivera's mental health was quite stable between 2005 to 2009.  (Doc. 132-2, ECF pp. 1 - 71; KSMF ¶ 6.)  During this time Mr. Rivera carried diagnoses of major depressive disorder and anxiety not otherwise specified (NOS).[3]  He took medication for these conditions and his dose and medication was adjusted from time to time.  (*Id.*)

On December 26, 2007, Dr. Kale met with Mr. Rivera who reported he was "OK". He reported no new problems, medication compliance and no side effects.  His appetite, sleep, and energy levels were good.  He exhibited no dysphoria, irritability or anxiety.  He noted that since his cousin was moved to SCI-Dallas and onto his block he has been feeling a lot better.  (KSMF ¶ 12; Doc. 132-2, ECF p. 18.)  On a scale of 1 to 10, Mr.

---

[3]  "NOS" is a term used under the Diagnostic and Statistical Manual (DSM-IV) to describe any condition which does not strictly meet all the diagnostic criteria.  (KSMF ¶ 12.)

Rivera reported feeling an 8.  (*Id*.)  He denied any feelings of suicidality or homicidality, and denied any auditory or visual hallucinations.  Dr. Kale's diagnoses were major depressive disorder, and anxiety disorder NOS.  Dr. Kale planned to continue Mr. Rivera on his present medication, Prozac, and see him again in twelve weeks.  (*Id*.; KSMF ¶ 12.)  On December 26, 2007, Dr. Kale renewed Mr. Rivera's Prozac until April 20, 2008.  (Doc. 132-2, ECF p. 35.)

Dr. Kale next saw Mr. Rivera on March 19, 2008.  (KSMF ¶ 13; Doc. 132-2, ECF p. 19.)  Mr. Rivera reported his was "OK," and that his appetite, sleep and energy levels were good.  At this point, Mr. Rivera was employed in the institution's mattress factory for six years.  He was calm and cooperative and reported no dysphoria, irritability or anxiety.  (*Id*.)  He again reported feeling an 8 on a scale of 1 to 10.  He had a full range of affect, and denied any feelings of suicide or homicidal thinking.  (*Id*.)  He also denied any auditory or visual hallucinations or delirium.  (*Id*.)  His diagnosis remained unchanged.  (*Id*.)  Dr. Kale discussed Mr. Rivera's treatment with him.  He was taking Prozac and was aware of the potential side effects.  He knew how to access mental health staff if needed.  Dr. Kale planned to see Mr. Rivera in three months and noted his plan to continue his prescribed medications (Prozac).  (*Id*.)  Dr. Kale then wrote a script renewing Mr. Rivera's Prozac for four months.  (Doc. 132-2, ECF p. 35.)

Mr. Rivera saw Dr. Kale again on June 11, 2008.  (KSMF ¶ 14; Doc, 132-2, ECF p. 16.)  Mr. Rivera told Dr. Kale "I'm good."  (*Id*.)  Mr. Rivera was taking Prozac and experiencing no side effects.  (KSMF ¶ 14.)  He reported no new problems. His appetite, sleep and energy were good.  He denied any dysphoria, irritability, or anxiety.  (*Id*.)  Dr.

Kale's objective exam was normal.  Mr. Rivera reported being an 8 on the scale of 1 to 10, had no evidence of delusions and had a generally euthymic outlook.  Dr. Kale's diagnoses were the same — depression and anxiety.  He planned to continue his treatment on Prozac and to see him again in three months.  (*Id*.)  There is no corresponding physician's order renewing Mr. Rivera's Prozac on that date.  (KSMF ¶ 19; Doc. 132-2, ECF pp. 32 - 44.)

On June 26, 2008, Mr. Rivera was seen by psychologist Nancy Taylor.  She noted that he said he was "okay."  (Doc. 132-2, ECF p.8.)  Her assessment was normal — Mr. Rivera was cooperative and his appearance was normal.  She noted that he was a "very quiet inmate."  (KSMF ¶ 15.)  Psychologist Taylor saw Mr. Rivera again on July 29, 2008.  (Doc. 132-2, ECF p. 9.)  She recorded his statement that he was "okay."  (Doc. 132-2, ECF p. 9.)  Her assessment was broadly normal and she planned to continue regular contact with him.  (*Id*.)

Dr. Kale next saw Mr. Rivera on September 2, 2008.  (KSMF ¶ 17; Doc. 132-2, ECF p. 17.)  Mr. Rivera reported "I'm okay," and reported no new problems.  (KSMF ¶ 17.)  Dr. Kale noted "patient says that he has [not] had his medications since three weeks ago because it ran out.  Wants a trial without medication."  (Doc. 132-2, ECF p. 17.)  Dr. Kale noted that Mr. Rivera said he had been exercising regularly and he had lost weight and felt healthy.  He was running twice a week.  His appetite, sleep and energy were reported to be good, and he reported no dysphoria, irritability or anxiety.  (KSMF ¶ 17.)  His speech was normal in rate and volume, and he reported his mood was 8/10, and euthymic.  His affect was within normal limits.  Dr. Kale's diagnoses were the same.  He ordered the

Prozac discontinued per Mr. Rivera's request, noting also that he hadn't been taking it for three weeks. He ordered a follow up appointment in eight weeks. (*Id.*)

Mr. Rivera's Medication Administration Record (MAR) for the month of July 2008 reflects that his Prozac prescription which began on March 23, 2008, expired on July 21, 2008. (Doc. 132-2, ECF p. 54.) The MAR reflects Mr. Rivera's last dosage for Prozac was dispensed on July 21, 2008. (*Id.*)

Mr. Rivera's next psychiatric appointment was with Dr. Mattich on October 27, 2008. (Doc. 132-2, ECF p. 14.) Dr. Mattich noted that Mr. Rivera was doing very well and having no complaints. (*Id.*; KSMF ¶ 20 and DSMF ¶ 20.) Dr. Mattich noted that Mr. Rivera was a 54 years old man from Puerto Rico who had been in jail for 22 years on a life sentence. He noted that Mr. Rivera had taken a variety of medications over the years, and that his last medication, Prozac was discontinued in August. (*Id.*) He remarked that Mr. Rivera had no history of suicidality, but suffered from episodic depression. He was eating and sleeping well, denied hallucinations, and showed no gross signs of psychosis. Dr. Mattich reported the "inmate is very pleasant and friendly." (Doc. 132-2, ECF p. 14.) His affect was flexible and he was frequently smiling. His mood was euthymic. Dr. Mattich's diagnoses were mood disorder — in remission; anxiety disorder — in remission, and polysubstance dependence by history. (*Id.*) Dr. Mattich noted that Mr. Rivera should be seen again in three months. (*Id.*)

The PRT met two days later on October 29, 2008. (*Id.* at ECF p. 68.) Dr. Mattich, Mr. Rivera's counselor, the nursing supervisor, his unit manager from L Block, and others involved with his care participated in the review. (KSMF ¶ 21.) They noted Mr. Rivera

was a lifer and that he was doing well. He denied psychosis or depression and was not suicidal or homicidal. He had stopped his Prozac and was stable without his medication. The plan was to review Mr. Rivera in three months and discharge him from the mental health roster if stable. (*Id.*)

On December 10, 2008, the PRT met again as it was asked for an opinion on whether there was a mental health reason requiring Mr. Rivera to have a Z Code. Dr. Kale, Ms. Klem and Mr. Rivera's counselor participated in this meeting. (KSMF ¶ 22; Doc. 132-2, ECF p. 67.) The PRT noted that Mr. Rivera was on the active mental health roster but there was "no current psychiatric indication for Z Code at this time." (*Id.*) It was also noted that Mr. Rivera stated he was doing well and was not using any psychotropic medications. He was not reporting symptoms and was not suicidal or homicidal. (KSMF ¶ 22.)

On December 16, 2008, a Vote Sheet, was processed concerning the removal of Mr. Rivera's Z Code. (Doc. 136-3, ECF p. 62.) Counselor Sokaloski, UM Goyne, Deputy Superintendent Demming, Ms. Klem, Major Brittain and others participated in this process. (*Id.*) The psychologist supported the revocation of Mr. Rivera's Z Code (DSMF ¶ 23) as did every participant in the review. (Doc. 136-3, ECF p. 62.) Superintendent Klopotoski made the final decision to remove Mr. Rivera's Z Code. (DSMF ¶ 28.) Mr. Rivera learned of the revocation of his Z Code on December 23, 2008. (DSMF ¶ 29.)

Shortly after learning of the revocation, Mr. Rivera set his cell on fire. (DSMF ¶ 30.) He was admitted to a POC because he made a suicidal threat. (KSMF ¶ 23.) Psychiatrist Dr. Kasayapanand ordered his admission to the POC. (KSMF ¶ 23.) He was given Ativan and put on Prozac. On December 24, 2008, Dr. Kasayapanand noted that Mr. Rivera had

lost his Z Code and stated that he wanted to kill himself. (Doc. 132-2, ECF p. 51.) He was not psychotic and would not answer questions about any suicidal ideation. (*Id*.) His diagnosis was major depressive disorder. Dr. Kasayapanand noted that Mr. Rivera was a lifer, and that "this is a protest gesture about Z Code." (*Id*.) Dr. Kasayapanand also noted that Mr. Rivera should be kept at the POC for awhile but constant watch could be stopped. (*Id*.) Dr. Kasayapanand noted on December 26, 2008, the day of Mr. Rivera's discharge from the POC, Mr. Rivera voiced that he still did not want to be double celled with anyone. (*Id*. at ECF p. 49.) He claimed that a previous psychiatrist took "his medications off." (*Id*.) Mr. Rivera then discussed every unfortunate life event that ever happened to him and noted that he had become upset when his single cell was taken away. (*Id*.) His affect was normal and his mood was fair. (*Id*.) It was noted that he did not appear suicidal and was vague about it. (*Id*.) Dr. Kasayapanand's diagnosis was depression NOS, adjustment disorder, and antisocial personality disorder. He noted that the "bone of contention was his Z Code, and that he had nothing to lose." (*Id*.) Dr. Kasayapanand noted "[n]eed security to get involved to make double cell palatable to him." (*Id*.) Prozac and Trazodone were ordered for Mr. Rivera at time of discharge. (KSMF ¶ 25; *see also* DSMF ¶ 36.)

Following his release from the POC and subsequent placement in the RHU, Dr. Kasayapanand saw Mr. Rivera on December 31, 2008. (Doc. 136-3, ECF p. 86; DSMF ¶ 41; KSMF ¶ 26.) Dr. Kasayapanand noted that his mood and affect were unremarkable and he was not psychotic. Dr. Kasayapanand's diagnosis was mood disorder NOS, and antisocial personality disorder. (KSMF ¶ 26.) The doctor wrote "pt is in practical in single

cell in RHU." (*Id.*)  Dr. Kasayapanand planned to have him return to be seen in a month. (*Id.*)

Mr. Rivera was seen by Eugene Lucas, CRNP, a psychiatric nurse practitioner on January 12, 2009.  (Doc. 132-2, ECF pp. 12 and 15; DSMF ¶ 42; KSMF ¶ 27.)  Mr. Lucas noted that Mr. Rivera reported "not doing too good.  I am in here [the RHU] about my single cell.  I am upset about the situation.  I get racing thoughts and feel anxious.  I am down since I am in the RHU.  I don't sleep well." (Doc. 132-2, ECF p. 15.)  Mr. Lucas noted he was alert and oriented, his speech was relevant and coherent, and his mood was mildly anxious.  His thoughts were organized and content-appropriate, and goal-directed.  He was "obsessing on a single cell status resulting in anxiety."  He denied suicidal thoughts.  His diagnoses were depression and anxiety.  Mr. Lucas increased his Prozac to 40 mg every morning.  He also noted "single cell discussion to PRT." (Doc. 132-2, ECF p. 12.)

On January 28, 2009, Psychiatrist Jane Jesse saw Mr. Rivera.  (*Id.*, DSMF ¶ 43; KSMF ¶ 28.)  He reported being anxious because he had a cellmate in the RHU.  (KSMF ¶ 28.)  He made threats that he could hurt his cellmate because "I'd just go off." (Doc. 132-2, ECF p. 12.)  He was in an angry mood, but had goal-directed thoughts and no suicidal thinking.  "Clearly unhappy about the loss of Z Code." (*Id.*; KSMF ¶ 28.)  Dr. Jesse also noted Mr. Rivera did not want an explanation about the decrease in Z Codes and refused to discuss medication options she might offer.  She noted he had limited insight and social adjustment.  Her diagnoses were polysubstance dependence by history, and anxiety disorder secondary to his situation.  She continued his medication as prescribed and recommended Mr. Rivera ask to contact psychology to help him cope with

his situation. (Doc. 132-2, ECF pp. 12 - 13.) On February 18, 2009, Dr. Jesse went to Mr. Rivera's RHU cell but he was not in his cell, he was in the exercise yard. (KSMF ¶ 29; DSMF ¶ 45.)

Mr. Rivera was seen by a CRNP Lucas on February 23, 2009. (Doc. 132-2, ECF p. 13; KSMF ¶ 30; DSMF ¶ 46.) Mr. Rivera complained of not sleeping well and requested something for sleep. He was alert and pleasant. His mood was mildly anxious and his affect consistent. His thoughts were organized, content appropriate, and goal directed. CRNP Lucas lowered Mr. Rivera's Prozac dose and continued his Benadryl. (KSMF ¶ 30.)

Dr. Jesse attempted to meet with Mr. Rivera on March 2, 2009, but he was not in his RHU cell at the time of her visit. (DSMF ¶ 48.) Dr. Jesse met with Mr. Rivera on March 9, 2009. (Id. at ¶ 49.) On March 18, 2009, in response to Mr. Rivera's request to psychiatry for help with being placed in H-Block, the Special Needs Unit (SNU), upon his release from the RHU, Dr. Jesse to see Mr. Rivera in his RHU cell. However, he was not in his cell. (Doc. 132-2, ECF p. 11; KSMF ¶ 31; DSMF ¶ 50.)

Dr. Jesse saw Mr. Rivera per his request on March 27, 2009. (KSMF ¶ 32.) At that time he was housed not on H-block, but L-block, and complained of being housed with a cellmate 'who smokes like a chimney". (KSMF ¶ 32.) He wanted a single cell. (*Id*.) He reported being anxious and not sleeping. (*Id*.) Mr. Rivera brought pictures of his family to show Dr. Jesse. (*Id*.) She noted Mr. Rivera told her he "is going to try the legal route to keep his Z-Code." (*Id*.) Objectively, Dr. Jesse noted that Mr. Rivera had good hygiene, talked a lot and had a self-entitled attitude. (Doc. 132-2, ECF p. 11.) His mood was euthymic and his affect stable. He looked calm. He reporting seeing "demons" at night,

but only sometimes, and Dr. Jesse saw no evidence of psychosis.  (*Id*.)  Dr. Jesse

increased Mr. Rivera's Prozac to 40 mg to help alleviate his anxiety.  She also referred

him to counseling to address the stress of double celling.  She planned to see him again

in one month.  (KSMF ¶ 32; Doc. 132-2, ECF p. 11.)


      **C.**    **Mr. Rivera's Housing History at SCI-Dallas**

     On June 29, 2005, the PRT met to discuss Mr. Rivera's care.  (KSMF ¶ 7; Doc.132-

2, ECF p. 63.)  At that time, Mr. Rivera was housed on H Block.  (Doc. 132-2, ECF p. 63.)

Dr. Kale and over twenty other individuals, including Mr. Rivera's psychologist and unit

manager participated in the review.  (*Id*.)  Dr. Kale noted that Mr. Rivera was "medication

compliant, stable, but pre-occupied with Z Code."  (Doc. 132-2, ECF p. 63.)  His Unit

Manager also noted that he "continues to campaign for Z code."  (*Id*.)  The PRT met again

on October 22, 2005.  (KSMF ¶ 8; Doc. 132-2, ECF p. 62.)  Participants included Dr. Kale,

psychologist Kevin Miskell, Mr. Rivera's Unit Manager, and several other counselors and

psychologists.  (*Id*.)  Dr. Kale noted Mr. Rivera was "medicating, doing well, life sentence,

no problems."  (KSMF ¶ 8.)  Psychology reported Mr. Rivera as "stable."  (Doc. 132-2,

ECF p. 62.)  However, his counselor noted that he "seems paranoid — may benefit from Z

code."  (*Id*.)

     In April 2005, Mr. Rivera was granted a Z Code due to concerns that he might harm

a cellmate during a paranoid episode.  (DSMF ¶ 12.)

     Another PRT review was held on January 11, 2006.  (Id. at ECF p. 61.)  At that time

Mr. Rivera was still housed on H Block, the SNU.  (*Id*.)  The PRT noted "consider

movement from SNU to general population." (*Id.*) Dr. Kale noted that Mr. Rivera was a lifer, who "[m]ay be feigning symptoms to stay on H-Block for single cell." (*Id.*) His Unit Manager noted that Mr. Rivera was "resistive to moving from H-Block ." (*Id.*)

On March 1, 2006, the PRT held another review. The PRT noted that Mr. Rivera was "O.K. for general population." (Id. at ECF p. 60; KSMF ¶ 9.) Dr. Kale noted that Mr. Rivera was medicating and was stable. He was doing well and worked in the mattress factory. (Doc. 132-2, ECF p. 60.) His counselor noted that he appeared stable enough for general population. (*Id.*) His Unit Manager noted that he had a Z Code listed in his record, and that Major Mooney suggested he should move to general population. He concluded that the "PRT sees no contraindications." (*Id.*)

On December 16, 2008, Mr. Rivera's Z Code status was reviewed by Counselor Sokaloski, Unit Manager Goyne, Deputy Superintendent Demming, a psychologist, Major Brittan, a corrections officer and other institutional staff. (DSMF ¶ 22; *see also* Doc. 136-3, ECF p. 62.) Counselor Sokaloski and the psychologist noted Mr. Rivera was doing well. (*Id.*) The group noted that Mr. Rivera had not had any misconducts in a two year period and had regular employment in the institution's mattress factory. (DSMF ¶ 25.) It was noted that Mr. Rivera had received his Z Code in 2005 "due to paranoid tendencies. He is stable and doing well and is not taking psychotropic medication at this time. IM is on the Active MH/MR Roster and has a Mental Health Stability Code of 'C'." (Doc. 136-3, ECF p. 62.) The reviewing staff recommended that Mr. Rivera's Z Code status be revoked. (*Id.*) Deputy Superintendent Walsh reviewed the input and recommendations of the reviewing staff and concurred in the recommendation to remove Mr. Rivera's Z Code status. (*Id*;

*see also* DSMF ¶ 27.)  Superintendent Klopotoski made the final decision to remove Mr. Rivera's Z Code.  (DSMF ¶ 28.)

On December 23, 2008, Mr. Sokaloski informed Mr. Rivera of the decision to revoke his Z Code.  (DSMF ¶ 30.)  Shortly thereafter Mr. Rivera lit his cell on fire.  (*Id*.)  The fire was extinguished by corrections officers and Mr. Rivera was escorted to the infirmary for medical evaluation and treatment.  (Id. at ¶¶ 31 - 32; *see also* Doc. 136-3, ECF pp. 34 - 38.)  Plaintiff had no physical injuries but stated he was having suicidal thoughts.  (DSMF ¶ 33.)  As a result, he was housed in a POC.  (*Id*.)

Mr. Rivera was discharged from the POC on December 26, 2008, and placed in the RHU due to his receipt of a misconduct for arson and destroying property.  (DSMF ¶¶ 34 and 37.)   On December 29, 2008, Mr. Rivera pled guilty to prison misconduct charges of arson and destroying property.  (Id. at ¶ 38.)  He received the sanction of ninety days of disciplinary custody and assessed the costs associated with the fire.  (Id. at ¶ 39.)

While in the RHU, Mr. Rivera was seen regularly by the mental health professionals at the facility.  (Id. at ¶ 40.)

On March 20, 2009, Mr. Rivera was seen by the Program Review Committee (PRC) to review his RHU confinement.  (Id. at ¶ 51.)  Defendant Walsh was one of three prison administrators participating in the PRC review.  (*Id*.¶ 52.)  Mr. Rivera was advised that he would be released to general population on March 22, 2009, at the conclusion of his disciplinary custody time.  (*Id*. at ¶ 53.)  Mr. Rivera was informed that he would be doubled celled in general population because he did not "meet[ ] the criteria for single celling".  (Doc. 136-3, ECF p. 41.)  Mr. Rivera agreed to be double celled with his cousin

who also was housed on L-Block.  (*Id*.; DSMF ¶ 53.)  He was advised that "his unit team would continue to monitor his progress in an effort that he would make a successful transition back to population.  PRC did contact his Unit Manager, Mr. Goyne, in an effort to smooth this transition."  (Doc. 136-3, ECF p. 41.)

Mr. Rivera gave a deposition in this matter on October 25, 2013.  (Doc. 136-3, ECF p. 1.)  At that time he conceded that, although his Z code was removed in December 2008, for the next three years he had a cell to himself and only been double-celled for "a couple of days" here and there.  (DSMF ¶ 72; Doc. 136-3, ECF pp. 12 - 13; Doc. 144, ECF p. 18.)

### D.    Grievance No. 268049

The DOC has an Inmate Grievance System which is set forth in Administrative Directive 804 (DC-ADM 804).  (DSMF ¶ 57.)  This policy sets forth a three-tiered administrative remedy process an inmate must follow to fully exhaust their grievance. (Doc. 136-4, ECF pp. 18 - 33.)  First, an inmate is required to submit a grievance within fifteen working days of the event on which the grievance is based.  (DSMF ¶ 58.)  The grievance must be submitted at the institution where the incident complained of occurred, and must identify any individuals directly involved in the events giving rise to the grievance.  (*Id*.)  The inmate must also specifically request any form of compensation or other legal relief normally available from the court that he or she seeks.  (*Id*. at ¶ 59.) Upon receipt of the grievance, the institution's Grievance Coordinator assigns it to the appropriate Department Head or management level staff person to provide the initial

review of the grievance, a Unit Manager would be assigned to provide initial review of a grievance regarding a housing unit.  (Doc. 136-4, ECF pp. 20 - 21.)  An inmate who is dissatisfied with the initial review decision may file an appeal to the Facility Manager (the Superintendent) within ten working days from the date of the initial review decision.  (DSMF ¶¶ 60 - 61.)  An inmate may appeal the decision of the Facility Manager to the Secretary's Office of Inmate Grievances and Appeals (SOIGA) within fifteen working days from the date of the Facility Manager's decision.  (*Id*. at ¶ 62.)

Mr. Rivera filed grievance 268049 on April 7, 2009.  (DSMF ¶ 56; Doc. 136-4, ECF pp. 38 - 39.)  He filed the grievance "to address the issue of the PRC stripping me of my single cell status".  (Doc. 136-4, ECF p. 38.)  Mr. Rivera alleges "that the PRC and other staff named above stripped me of my single cell because of lack of bed space and bureaucratic bungling with the parole system and extreme backlog in cases.  Their decision was motivated entirely by non-medical and non-psychological factors."  (*Id*. at ECF p. 39.)  On April 15, 2009, UM Goyne issued the initial review response to grievance 268049.  UM Goyne denied the grievance as untimely as it was submitted more than fifteen days after December 24, 2008, the date Mr. Rivera was advised that his Z code had been revoked and he was directed to double cell.[4]  (*Id.* at ECF p. 45.)  Mr. Rivera filed an appeal to the Facility Manager.  (Doc. 136-4, ECF pp. 50 - 51.)  Mr. Rivera argued that his "grievance [was] about what [he] was told at [his] PRC review on March 20 and the

_____

[4]  The parties do no dispute that Mr. Rivera was informed of the decision to revoke his Z Code on December 23, 2009.  (DSMF ¶ 29; Doc. 144, ECF p. 16.)  It appears that UM Goyne's refers to December 24, 2008 in his initial response was in error.  This error, however, does not create a dispute of material fact.  Likewise, this error would not have made a difference as to UM Goyne's determination that the grievance was untimely to the extent it challenged the December 2008 revocation of Mr. Rivera's Z code.

subsequent report that was issued shortly thereafter." (*Id*. at ECP p. 51.) He argues that the grievance was erroneously denied as untimely since he can challenge the appropriateness of his double celling as "an ongoing controversy." (*Id*.) The Facility Manager denied the appeal, upholding UM Goyne's determination that the grievance was untimely submitted. (*Id*. at ECF p. 53; DSMF ¶ 64.) Mr. Rivera appealed that decision to SOIGA. (DSMF ¶ 65; Doc. 136-4, ECF pp. 35 - 55.) He again asserted that his grievance challenged the PRC's decision to "take [his] Z code" and his alleged agreement to double cell with inmate Pena once released from the RHU. (Doc. 136-4, ECF p. 35.) He claims his challenge is based on the PRC's report of March 20, 2009, and therefore was not untimely. (*Id*. at ECF pp. 35 - 36.) SOIGA upheld the dismissal of the grievance for lack of timeliness. (*Id*. at ECF p. 34; DSMF ¶ 65.)

The first grievance Mr. Rivera ever filed while housed at SCI-Dallas was Grievance 268049 on April 7, 2009. (DSMF ¶ 56; Doc. 136-3, ECF pp. 7 and 11.)


**E.** **DOC Defendants' Involvement in March 2009 PRC Decision to Double Cell Mr. Rivera in General Population Upon his RHU Release.**

Years prior to this event, Deputy Superintendent Walsh was Mr. Rivera's corrections counselor unit when he was housed on H-Block, the Special Needs Unit. (Doc. 136-3, ECF p. 3.) Deputy Superintendent Walsh participated in the decision to recommend a Z code for Mr. Rivera in 2005. (Doc. 136-3, ECF p. 14.) Deputy Superintendent Walsh participated in the March 20, 2009, PRC Review. (Doc. 136-3,

ECF p. 41.)  Neither Dr. Kale nor any other DOC defendant (other than Deputy Walsh) took part in that PRC review.  (*Id*.)

The PRC advised Mr. Rivera that he would be released to general population on completion of his disciplinary custody time on March 22, 2009.  (DSMF ¶ 53.)  He was also advised he would be double celled in general custody.  (*Id*.)  Mr. Rivera returned to his general population housing unit on March 22, 2009.  (DSMF ¶ 54.)

## IV.    Discussion

### A.    Mr. Rivera's Failure to Exhaust his Available Administrative Remedies as to the December 2008 Revocation of his Z Code.

Pursuant to the Prison Litigation Reform Act (PLRA), before a prisoner may bring a civil rights action pursuant to 42 U.S.C. § 1983, or any other federal law, he must exhaust all available administrative remedies.  *See* 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 524, 122 S.C. 983, 988, 152 L.Ed.2d 12 (2002); *Small v. Camden Cnty,* No. 11-2378, 2013 WL 4504761, at *2 (3d Cir. Aug. 26, 2013).  The exhaustion requirement is mandatory.  *See Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010).  A prisoner must "exhaust all available administrative remedies" regardless of whether the administrative process may provide the prisoner with the relief that he is seeking.  *Nyhuis v. Reno*, 204 F.3d 65, 75 (3d Cir. 2000).  Exhaustion of all available administrative remedies is a precondition to litigation, subsequent exhaustion after the suit is filed is insufficient.  *Toney v. Bledsoe*, 427 F. App'x 74, 77 (3d Cir. 2011)(citing *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003)).  "Failure to exhaust administrative remedies is an affirmative defense that

must be pled and proven by the defendant." *Brown v. Croak,* 312 F.3d 109, 111 (3d Cir. 2002).

The exhaustion requirement of the PLRA is one of "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 84, 126 S.Ct. 2378, 2383, 165 L.Ed.2d 368 (2006). Failure to substantially comply with the procedural requirements of the applicable and available prison's grievance system will result in a procedural default of the claim. *Woodford*, 548 U.S. at 90, 126 S.Ct. at 2385; *Spruill v. Gillis*, 372 F.3d 218, 227-32 (3d Cir. 2004). A prisoner cannot bypass available administrative remedies, either by failing to properly exhaust the prison's administrative remedy process, or by waiting until such remedies are no longer available. *Woodford*, 548 U.S. at 95, 126 S.Ct. at 2388. However, if the actions of prison officials directly caused the inmate's procedural default of a grievance, the inmate will not be held to strict compliance with the exhaustion requirement. *Brown*, 312 F.3d at 112-113. "Where [the inmate] failed to receive even a response to the grievances addressing the ... incidents, much less a decision as to those grievances, the [administrative remedy] process was unavailable to him." *See Small*, 2013 WL 4504761, at *6.

The undisputed record before the court reveals that the first grievance Mr. Rivera ever filed at SCI-Dallas was Grievance 268049 on April 7, 2009. This undisputed fact simplifies several issues. Based on a thorough review of Grievance 268049, and the undisputed record in this case, the court finds that Mr. Rivera failed to exhaust his administrative remedies as to his claims concerning Dr. Kale's discontinuation of his

psychotropic medications as well as his claim concerning the December 2008 revocation of his Z Code by the DOC defendants.

In accordance with the DOC's Inmate Grievance Policy, inmates must submit their initial grievance within fifteen days of the event which led to the filing of the grievance. Grievance 268049 was not submitted within fifteen days of Dr. Kale failing to renew Mr. Rivera's psychotropic medications, or even within fifteen days of his Prozac script ending. Thus, Mr. Rivera's claim against Dr. Kale for his alleged failure to continue his psychotropic medications is unexhausted.[5] Likewise, to the extent Mr. Rivera argues that Grievance 268049 encompasses a complaint concerning the December 23, 2008, revocation of his Z Code, he has failed to properly exhaust the issue as his grievance was untimely filed.

Mr. Rivera argues that defendants somehow interfered with his ability to file a timely grievance concerning the revocation of his Z Code on the basis that his mind was "cloudy" due to Dr. Kale's failure to renew his psychotropic medication. His argument is unpersuasive and unsupported by the record. (Doc. 144-1, ECF pp. 14 - 15.) First, Mr. Rivera's Prozac prescription expired on July 21, 2008, as demonstrated by his MAR card. He was seen by a psychologist on July 29, 2008 and expressed no problems and was assessed as "broadly normal." He was seen by Dr. Kale on September 2, 2008, and reported his mood was "8/10." On October 27, 2008, almost three months after his last

---

[5] Dismissal of an inmate's claim is appropriate when the prisoner has failed to exhaust his available administrative remedies before bringing a civil-rights action. *Oriakhi v. United States*, 165 F. App'x 991, 993 (3d Cir. 2006) (nonprecedential). However, as Dr. Kale did not raise this defense in his summary judgment motion, the court cannot, and will not, dismiss Mr. Rivera's Eighth Amendment claim against Dr. Kale on this basis.

Prozac dose, by Dr. Mattich and reported "doing very well and having no complaints." Likewise, Mr. Rivera continued to maintain his employment in the mattress factory many months after his Prozac was discontinued. Additionally, on December 23, 2008, lighting his cell on fire upon learning of the revocation of his Z Code, Mr. Rivera was only housed in the POC for a very brief period, 3 days. Moreover, shortly after his admission to the POC, his treating psychiatrist found Mr. Rivera was not psychotic and that his "constant watch could be stopped." (Doc. 132-2, ECF p. 51.) Mr. Rivera was transferred from the POC to the RHU on December 26, 2008. There are no incidents of suicidal behavior, critical psychiatric episodes or disciplinary issues noted in the record for the duration of Mr. Rivera's RHU stay.[6] While anxious and unsettled about the loss of his single cell, Mr. Rivera appeared alert and oriented to treatment staff. Additionally, while in the RHU he was mentally clear enough able to send a request slip to see the psychiatrist. (*Id.* at ECF p. 11.) Although disputed by the DOC defendants, Mr. Rivera alleges he also sent Defendant Lopuhovsky a request slip while he was in the RHU. (Doc. 136-3, ECF p. 7.) In sum, there is no evidence in the record to suggest that Mr. Rivera was mentally incapable of pursuing a timely grievance concerning the revocation of this Z Code. There is also no evidence in the record that Mr. Rivera sought permission to file a grievance concerning the revocation of his Z Code prior to learning he was being released to a double cell in general population in March 2009. He produces no evidence to support his self-serving affidavit as to his "clouded" mental state or when his alleged brain fog lifted.

---

[6] The court notes that Mr. Rivera's disciplinary custody stay in the RHU did not extend beyond the expected ninety day sanction imposed by the hearing examiner after he pled guilty to the misconduct for arson and destruction of property related to the events of December 23, 2008.

Accordingly, all DOC defendants are entitled to summary judgment as to the December 2008 revocation of Mr. Rivera's Z Code based on his failure to properly exhaust this issue via the DOC's administrative remedy process.

Next, the court turns to address Mr. Rivera's exhaustion of his second claim, i.e. that Deputy Superintendent Walsh was deliberately indifferent to his mental health needs when he failed to reinstate his Z Code when releasing him from the RHU to general population.[7]  Contrary to the DOC defendants' assertion, a review of Grievance 268049 clearly reveals that Mr. Rivera did include this issue in the grievance.  "Of the PRC I am naming Dpty. Walsh, Dpty. Mooney, and U.M. Galen Miller.  They issued a PRC report stating that I do not meet the criteria for double celling on March 23, 2009.  This was based on my PRC review of March 20."  (Doc. 136-4, ECF p. 38.)  The language of the grievance supports Mr. Rivera's assertion that "Grievance No. 268049, submitted on 4/2/09, and filed on 4/7/09 was in fact *concerning the PRC's March 20, 2009 decision failing to reinstate his Z-code single-cell status*".  (Doc. 144, ECF p. 12) (emphasis added).  While Mr. Rivera's grievance most likely does not comply with other requirements of the DOC's grievance policy, the grievance was rejected by Mr. Goyne strictly on the basis that it was untimely as it was held only to address the December 2008 revocation of his Z Code.  (Doc. 136-4, ECF p. 45.)  The initial grievance response did not address the PRC's failure to reinstate his Z Code when releasing him from the RHU.  Additionally, Mr. Rivera's grievance with respect to his challenge of the PRC's failure to reinstate his Z

---

[7]  Mr. Rivera basis his second claim on the PRC's actions of March 20, 2009.  Deputy Superintendent Walsh is the only DOC defendant who participated in that PRC decision.  Thus, Mr. Rivera's second claim is lodged solely against Deputy Superintendent Walsh.

Code when releasing him from the RHU was filed within fifteen working days from March 23, 2009.  Accordingly, the court will deny the DOC defendants' motion for summary judgment as to Mr. Rivera's claim that Deputy Superintendent Walsh was deliberately indifference to his serious mental health needs when he failed to find that Mr. Rivera met the criteria for a Z Code upon releasing him from the RHU in March 2009.  That issue will be further addressed, *infra*.

### B. Mr. Rivera's Eighth Amendment Claim against Dr. Kale due to his Failure to Timely Renew his Psychotropic Medication.

Title 42 U.S.C. § 1983 allows an injured person to seek damages for the violation of his or her federal rights against a person acting under color of state law.  *See* 42 U.S.C. § 1983; *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014).  "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citation omitted).  The Eighth Amendment prohibits "unnecessary and wanton infliction of pain," including "deliberate indifference to serious medical needs of prisoners."  *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  *Id*., 429 U.S. at 104, 97 S.Ct. at 291.  In order to state a cognizable Eighth Amendment medical claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  *Id*., 429 U.S. at 106, 97 S.Ct. at 292.  For conduct

to rise to the level of deliberate indifference, a plaintiff must demonstrate that a defendant's act or omissions constituted "an unnecessary and wanton infliction of pain" which is "repugnant to the conscience of mankind" and "offend[s] evolving standards of decency." *Id.* (quotation marks omitted). To satisfy this standard, a plaintiff must demonstrate both that: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer,* 511 U.S. at 834, 114 S.Ct. at 1977. The inmate must satisfy this two-part conjunctive test. Without the requisite mental state, a prison official's conduct alone will not constitute deliberate indifference. *Id.,* 511 U.S. at 837-38, 114 S.Ct. at 1979.

A medical need is serious where it "has been diagnosed by a physician as requiring treatment or is . . . so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)(citations omitted). The seriousness of an inmate's medical need may be determined by reference to the effect of denying that particular treatment. *Id.* The need for care must be such that "a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death." *Tsakonas v. Cicchi*, 308 F. App'x 628, 632 (3d Cir. 2009).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104, 97 S.Ct. at 291. Deliberate indifference occurs when a defendant realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk. *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979. (plaintiff must show that officials are "aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and they must also draw the inference.").  To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm."  *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009).

Prison medical authorities are "afford[ed] considerable latitude ... in the diagnosis and treatment of the medical problems of inmate patients," and negligence in the administration of medical treatment to prisoners is not itself actionable under the Constitution."  *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).  "In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'"  *Id.*, 429 U.S. at 105, 97 S.Ct. at 292; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *Durmer*, 991 F.2d at 67.  "Deliberate indifference," therefore, requires more than negligence, it requires "obduracy and wantonness," *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), which has been likened to conduct that includes reckless or conscious disregard of a serious injury.  *Farmer,* 511 U.S. at 836, 114 S.Ct. at 1978 (Deliberate indifference lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness.").

Likewise, mere disagreement as to the proper medical treatment does not support an Eighth Amendment violation; courts will defer to a treating physician's judgement regarding the propriety of a specific course of treatment.  *See Monmouth Cnty.*, 834 F.2d at 346 (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).  In the medical context,

the Court of Appeals for the Third Circuit has found "deliberate indifference" in a variety of circumstances, including where: (1) medical or prison officials intentionally refuse to provide care; (2) medical treatment is delayed for non-medical reasons; or (3) there is a denial of, or interference with, the inmate's receipt of prescribed medical treatment. *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993). To be deliberately indifferent, a prison official must know of, and disregard, an excessive risk to inmate health or safety. *Id.,* 511 U.S. at 837-38, 114 S.Ct. at 1979.

In this instance, Mr. Rivera alleges Dr. Kale is responsible for the disruption of his receipt of Prozac when he failed to reorder it.[8] Mr. Rivera claims that after bringing this oversight to Dr. Kale's attention in June 2008, he admitted forgetting to re-order it and advised Mr. Rivera that he would renew it, but again failed to do so. (Doc. 144, ECF pp. 8 - 9.) Mr. Rivera denies voluntarily stopping his Prozac and argues he stopped taking it because it was no longer prescribed for him. Even if Mr. Rivera is correct, that Dr. Kale forgot to renew his Prozac, the record before the court does not support a finding that Dr. Kale had the mental state required for Eighth Amendment liability.

The medical records before the court support Mr. Rivera's own statement that "every time" he saw Dr. Kale, he usually renewed his medication. Even if Dr. Kale was reminded by Mr. Rivera sometime between July and September 2, 2008 (the date of their next appointment), to renew his medication and Dr. Kale forgot a second time, this claim again appears to sound in negligence. There is no evidence in the record to suggest that Dr. Kale, or subsequent mental health professionals who came into contact with Mr.

---

[8] "Every time that I go to psychiatric, he renew my medication. I never had to send a request to renew my medication." Doc. 136-3, ECF pp. 9 - 10.

Rivera after July 21, 2008, were aware that he was in pain, was suffering, or decompensation due to his lack of Prozac. Mr. Rivera was not acting out and successfully maintained his employment after July 2008. His contact with mental health professionals continued to yield positive reports and lacked reports of suicidal or homicidal tendencies. To the contrary, the medical records indicate that on September 2, 2008, a month and a half after his medication was not renewed, Mr. Rivera reported feeling good, exercising and losing weight. Six weeks later, when he was seen by a different psychiatrist, Mr. Rivera was still doing well and had no complains. He denied hallucinations and showed no gross signs of psychosis. He was pleasant and friendly three months after receiving his last dose of Prozac. Additionally, Mr. Rivera fails to point to any evidence in the record to suggest he filed any request slips, grievances, or point to any portion of the medical records that demonstrate he voiced concerns of Dr. Kale's, or any other treatment staff's, failure to renew his Prozac prescription or express any side effects due to his lack of the medication. There is no evidence in the record that Mr. Rivera suffered any physical or psychological harm as a result of Dr. Kale's failure to renew his Prozac or that he sought psychological help for an issue that was ignored.[9] On December 10, 2008, almost four and a half months after the discontinuation of his Prozac, members of the PRT reviewed Mr. Rivera's mental health status. Treatment staff believed him to be doing very well without his medications, he was not reporting symptoms and was not suicidal or homicidal.

---

[9] As noted earlier, there is no evidence in the record to suggest that Dr. Kale's July 2008 failure to renew Mr. Rivera's Prozac was the proximate cause of Mr. Rivera's action of lighting his cell on fire in December 2008 when he learned his Z Code was revoked.

Regardless for the reason for the cessation of the Prozac medication in July 2008, Mr. Rivera continued to be followed by his unit team and mental health professionals at the prison. There is no evidence in the record to suggest that Dr. Kale, or any staff member, was aware Mr. Rivera was suffering or in distress due to the cessation of his Prozac. There is no evidence in the record that Mr. Rivera suffered any negative physical or psychological side effects due to the discontinuation of his Prozac.[10] Thus, while Dr. Kale may have been negligent in failing to renew Mr. Rivera's Prozac, Dr. Kale is entitled to summary judgment as to Mr. Rivera's Eighth Amendment claim of deliberate indifference to his mental health needs.

### C. Mr. Rivera's Request for Additional Discovery

Fed. R. Civ. P. 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specific reasons, it cannot present facts essential to justify its opposition, the Court may: (1) defer considering the motion or deny it: (2) allow time to obtain affidavits or declarations to take discovery; or (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). The Court of Appeals for the Third Circuit requires that such an affidavit must specify "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.'" *Pa. Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 157 (3d Cir. 2012) (alteration in original) (quoting *Dowling v. Cty. of Philadelphia*, 855 F.2d 136, 139 - 40 (3d Cir. 1988)).

---

[10] A prisoner may not bring a civil action under federal law "for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The alleged physical injury must be more than a *de minimis* injury but need not rise to the level of a significant injury. *Mitchell v. Horn*, 318 F.3d 523, 535 - 36 (3d Cir. 2003).

Mr. Rivera seeks time to conduct additional discovery and supplement his summary judgment opposition materials. (Docs. 149 and 150.) For the reasons that follow, Mr. Rivera's motions will be granted in part and denied in part.

This action commenced in 2010. All parties, including Mr. Rivera, have actively engaged in discovery. The discovery period in this case expired on November 1, 2013. (Doc. 79.) Although Mr. Rivera filed a brief in opposition to defendants' motions for summary judgment, he now seeks an enlargement of the discovery period to address the DOC defendants' defense that "Plaintiff has not established Corrections Defendants requisite personal involvement" and that "Plaintiff cannot establish Correctional Defendants' liability where they deferred to the opinions of Plaintiff's mental health professionals." (Doc. 150, ECF pp. 1 - 2.) Mr. Rivera seeks to pose document requests, interrogatories and take depositions "related to establishing that Correctional Defendants did have requisite personal involvement and that they did not defer to the Opinions of the pro se Plaintiff's treating mental Health Professionals." (*Id*. at ECF p. 2.) He argues he could not have posed this discovery early because the defendants failed to provide him with a copy of his October 25, 2013, deposition and the Correction Defendants have failed to provide complete responses to properly served interrogatories. (*Id*.) Finally, Mr. Rivera states he could not pose discovery related to these issues because he "was not aware of the Defendants' present strategy, he was lead to believe that this matter would be held over for trial, thus he made his discovery requests centered around his burden for trial." (*Id*.)

First, the court notes that on December 11, 2013, Mr. Rivera filed a motion to compel the disclosure of his October 2013 deposition. (Doc. 126.) That motion was filed

after the close of discovery and after the defendants filed their motions for summary judgment. Although Mr. Rivera claims his motion to compel was pending when he filed his motion to reopen discovery, it was not. The court denied his motion seeking *gratis* copies of his deposition transcript two weeks before Mr. Rivera filed his request for additional discovery and his brief in opposition to the defendants' motions. (Doc. 139.) Moreover, as it was Mr. Rivera's deposition that was taken, and not that of any defendant, it remains unclear to the court what information Mr. Rivera seeks from his own deposition that he would be unaware of (as the deponent) that would preclude summary judgment in this matter. Additionally, to the extent Mr. Rivera took issue with Deputy Superintendent Walsh's interrogatory responses that he attached to his motion (*see* Doc. 150, ECF pp. 5 - 8), he does not suggest when he received these incomplete responses, why he believes the responses are incomplete, or why he did not file a motion to compel a more thorough response prior to the close of discovery or the filing of dispositive motions.

What is known to the court is Mr. Rivera's desire to obtain discovery related to the DOC defendants personal involvement in, and reliance upon the opinions of mental health professionals, when revoking his Z Code in December 2008 and then failing to reinstate it in March 2009. Mr. Rivera specifically requests the opportunity to address defenses raised by the DOC defendants, and not Dr. Kale. Thus, to the extent Mr. Rivera's request is granted, he may not seek further discovery from Dr. Kale. Also, as the undisputed record demonstrates that Mr. Rivera failed to exhaust his claim against Dr. Kale, or the issue of the revocation of his Z Code, allowing discovery as to these issues would unnecessarily burden the defendants. Consequently, the only remaining issue in this matter is Deputy Superintendent Walsh's involvement in the March 2009 PRC decision to

double cell Mr. Rivera in general population upon his release from the RHU.  Accordingly,

Mr. Rivera will be granted thirty days to properly serve Deputy Superintendent Walsh with

discovery on this very limited issue.


      **D.**     **Defendant Walsh's Decision not to Reinstate Mr. Rivera's Z**
               **Code Upon His Release from the Restricted Housing Unit.**

Mr. Rivera claims that Deputy Superintendent Walsh was deliberately indifferent to

his serious mental health needs when he, as a member of the PRC, refused to reinstate

his Z Code upon his release from the RHU.  Mr. Rivera sought a Z Code assignment upon

his release due to his belief that the solace of a single cell was medically required given

the severity of his mental health problems.  The DOC defendants argue Deputy

Superintendent Walsh is entitled to summary judgment on this claim based on his

entitlement to rely on the opinions of Mr. Rivera's treating mental health professionals

when determining Mr. Rivera did "not meet the criteria for single celling"[11] when returning

him to his general population housing unit upon his release from the RHU. (Doc. 130, ECF

pp. 9 - 12.)[12]

As noted above, the court will deny the DOC defendants' motion for summary

judgment on this claim, without prejudice, and allow Mr. Rivera the opportunity to conduct

---

[11]  *See* Doc. 136-3, ECF p. 41.

[12]  The DOC defendants also argue that Mr. Rivera failed to alleged the personal
involvement of the DOC defendants in any claims other than the revocation of his Z code.  (Doc.
130, ECF p. 8.)  However, the DOC Defendants do not dispute that Mr. Rivera's claim against
Deputy Superintendent Walsh is based on his failure to reinstate his Z Code during the March 20,
2009 PRC.  (DSMF ¶ 77.)  Thus, the DOC defendants' motion for summary judgment as to this
claim based on Deputy Superintendent Walsh's alleged lack of personal involvement in the PRC's
decision not to grant Mr. Rivera a Z Code upon his RHU release, is denied.  *See Rode v.
Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

brief and narrowly defined discovery as to Deputy Superintendent Walsh's claim that he relied upon the professional opinion of Mr. Rivera's mental health providers when not assigning him a Z Code upon his RHU release. Deputy Superintendent Walsh may seek summary judgment as to this issue at the close of discovery.

An appropriate Order follows.

**/s/ A. Richard Caputo**
**A. RICHARD CAPUTO**
**United States District Judge**

**Date: September 21, 2015**